IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

APPFORGE, INC.,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )    C.A. No. 04-704 (GMS)
                                         )
EXTENDED SYSTEMS, INC.,                  )
EXTENDED SYSTEMS OF IDAHO, INC., )
EXTENDED SYSTEMS, LTD.,                  )
EXTENDED SYSTEMS BENELUX B.V.,  )
EXTENDED SYSTEMS, GMBH, and      )
EXTENDED SYSTEMS FRANCE, SARL. )
                                         )
              Defendants.                )

**MEMORANDUM**

## I.    INTRODUCTION

On June 29, 2004, AppForge, Inc. ("AppForge") filed a complaint against Extended Systems,

Inc. ("ESI"), alleging the following federal claims: copyright infringement, pursuant to 17 U.S.C.

§ 501, trademark infringement, pursuant to 15 U.S.C. § 1114, and unfair competition, pursuant to

15 U.S.C. § 1125(a).  The complaint also alleges deceptive trade practices and unjust enrichment,

pursuant to Delaware state law.  On August 12, 2004, AppForge amended its complaint to add

Extended Systems of Idaho, Inc. ("ESII"), Extended Systems, Ltd. ("ESI Ltd."), Extended Systems

Benelux B.V. ("ESI Benelux"), Extended Systems, GmbH ("ESI GmbH"), and Extended Systems

France, Sarl. ("ESI France") as defendants.[1]

Presently before the court is ESI and ESII's (collectively, the "defendants") motion to

dismiss the complaint or stay the action and compel arbitration.  For the following reasons the court

---

[1] ESI Ltd., ESI Benelux, ESI GmbH, and ESI France are foreign subsidiaries of ESI.  The court, therefore, will refer to these defendants collectively as the "ESI Foreign Subsidiaries."

will grant the motion to stay and compel arbitration.

## II.    BACKGROUND

### A.    Mobile Computing Devices[2]

Mobile computing devices allow users wireless access to services that previously required access to a "land line" wire connection. Mobile computing devices include the personal digital assistant ("PDA") and Blackberry™, which are handheld devices that can combine computing, telephone, Internet, access to data, and networking features. There are two categories of software that reside on mobile computing devices: (1) "application" software, a complex software program or group of programs designed for the users of computing devices, for example, spreadsheets and computer games; and (2) "platform" or "operating system" software, which provides the overall framework within which the applications operate, for example, Microsoft Windows®.

A user is unable to run an application unless the device has a compatible platform. Many applications can run on either one or a very small number of platforms. For example, the Microsoft Word for Windows® word processing application can run on the Microsoft Windows® operating system, but cannot run on the Macintosh® operating system. Therefore, a developer must create a separate and distinct version of Microsoft Word® for the Macintosh® operating system. This requires a significant amount of time and effort. Applications that run on multiple platforms, "cross-platform" or "multi-platform" applications, however, allow developers to write one application for use on a variety of operating systems. Cross-platform applications are considered valuable because

---

[2] The court is not completely familiar with the technology behind mobile computing devices, "application" software, and "platform" software. Therefore, the court has relied on the amended complaint and the parties' assertions to familiarize itself with the technology involved in this case. The court is relying on the above-mentioned documents only for background and informational purposes.

they allow developers to save time, effort, and expense associated with creating and maintaining one application for each platform.

**B.     The Parties' Software**

AppForge is a provider of software that allows its customers to design, develop, and utilize custom built applications that will run on mobile computing devices. According to the complaint, in September 2001, AppForge released for sale the APPFORGE MOBILEVB software, APPFORGE BOOSTER PLUS software, and the Piedmont SDK software (collectively, the "AppForge Software"). APPFORGE MOBILEVB and APPFORGE BOOSTER PLUS simplify the application development process. APPFORGE MOBILEVB includes pre-programmed modules and allows developers to create applications in the Visual Basic® computer language. APPFORGE BOOSTER PLUS allows applications created with APPFORGE MOBILEVB to run on the mobile computing devices. Applications created using APPFORGE MOBILEVB can run on hundreds of mobile computing devices, provided that the device contains a version of APPFORGE BOOSTER PLUS that works in conjunction with the operating system on that device.

Piedmont SDK is a software development tool that allows developers to create their own custom modules, in addition to the pre-programmed modules contained in APPFORGE MOBILEVB. It also enables developers to create "controls," or objects in a window that can be viewed by the user, for example, pull-down menus. The modules and controls created with Piedmont SDK are cross-platform and run on all mobile computing devices containing a compatible version of APPFORGE BOOSTER PLUS.

ESI is a holding company operating in the United States through its wholly-owned subsidiary ESII. Specifically, ESII develops software and markets it to application software developers for

mobile computers.  The developers then have the ability to write applications that take advantage of ESII's capabilities to access server data and thereby allow mobile computer users to tap into databases, e-mail, or other data on a server.  According to ESII, it has implemented various techniques to facilitate server data access.

In 2001, ESII marketed and sold two software products, the XTNDConnect Mobile Objects ("XCMO") and XTNDConnect synchronization solution ("Sync Product").  XCMO is a solution for application developers that enables mobile/handheld and PC applications to easily integrate live interaction with centrally located server-based objects.[3]  The Sync Product allows a user to take information stored on a mobile computing device and transfer it to a server or another computer.[4] In 2004, ESII discontinued selling XCMO and the Sync Product and began marketing new software called "OneBridge."  OneBridge is a combination of both techniques that ESII had previously marketed separately in the Sync Product and XCMO.

The Sync Product software and its corresponding software component of OneBridge include cross-platform controls that ESII developed using AppForge's Piedmont SDK.  According to ESII, application developers who purchase its software may or may not choose to utilize the cross-platform controls.  If a user chooses to utilize the cross-platform controls, he or she can obtain a license to use the Booster Plus™ program from AppForge.

---

[3] XCMO implements a technique that utilizes an essentially persistent connection between the mobile computer and the server, so that the applications on the mobile computer manipulate the server data directly via the essentially persistent connection, rather than manipulating a local copy of data.  (D.I. 27, at 2.)

[4] The Sync Product implements a technique that "synchronizes" two databases so that changes in one are reflected in another.  That is, a database on the mobile computer is established to mirror a subset of data on the server.  An application on the mobile computer then manipulates the local database.  The two databases are then occasionally synchronized.  (*Id.*)

C.    **The Agreements**

On October 31, 2001, AppForge and ESII entered into two license agreements, an Incorporation License Agreement ("ILA") and a Reseller Agreement.[5]  Under the terms of the ILA, AppForge granted ESII a non-exclusive license to use Piedmont SDK for the "sole and limited purpose of creating the Software to be incorporated into the XCMO Product (in executable form only)."  (D.I. 20, Ex. 1 ¶ 2.)  The ILA also provides that Piedmont SDK "shall only be used with your Customer Products, and may not be sold, licensed, leased, transferred, published or used separately from the Customer Products."  (*Id.*)  The ILA defines the terms "Software" and "Customer Products."  Software means "the set of cross-platform controls that integrate ESI client-side technology with AppForge Booster Plus™ for ESI created from the SDK . . ."  (*Id.* ¶ 1.4.)  The Customer Product is "the XTNDConnect Mobile Objects ("XCMO") . . ."  (*Id.* ¶ 1.7.)  The ILA, therefore, grants ESII a license to use the AppForge Software with only XCMO.[6]  In addition, the ILA does not contain an arbitration clause.

On October 31, 2001, ESII and AppForge also entered into a Reseller Agreement because ESII "desire[d] to bundle AppForge proprietary software with . . . [its] proprietary software," and AppForge "desired . . . [ESII] to bundle . . . [its] proprietary software with AppForge's proprietary software."  (D.I. 20, Ex. 2.)  The Reseller Agreement grants ESII two copyright licenses, a license

---

[5] The court notes that ESII is the only defendant that is a signatory to the agreements with AppForge.

[6] The defendants assert that the ILA grants ESII rights and licenses not necessary to a resolution of the issues in the present case.  AppForge disagrees, maintaining that the agreements were entered into in conjunction with one another and signed by the same party representatives. The court will discuss whether the ILA is necessary to resolve the motion to compel in section IV.B., below.

5

to use certain AppForge trademarks, and a license to use the AppForge Software for marketing and demonstrations (*See id.* §§ 1.2.1, 1.2.2, 1.2.4, 1.2.5.)  The Reseller agreement contains an arbitration clause.[7]

The present case arose when ESII began marketing its OneBridge software. According to the amended complaint, in the third quarter of 2003, the defendants stopped selling XCMO and the Sync Product and released OneBridge.  Between the fall of 2003 and June 2004, AppForge attempted to discuss with ESII its use of the AppForge Software in connection with OneBridge and whether ESII owed AppForge any licensing fees.  ESII responded, stating that it discontinued selling XCMO and, therefore, did not owe AppForge any licensing fees.  AppForge then filed the present action.  In response, ESI and ESII filed the present motion to compel arbitration and to dismiss or stay the case.

### D.     The Parties' Positions

ESI and ESII maintain that the arbitration clause covers all of AppForge's claims.  They assert that AppForge's claims are all dependent upon whether ESII has acted in accordance with its contractual rights, an issue that falls within the arbitration clause because it "aris[es] out of or in connection with" the Reseller Agreement.  It is the defendants position that the Reseller Agreement

---

[7] The arbitration clause provides:

> All disputes arising out of or in connection with this Agreement shall be solely and finally settled by arbitration, which shall be conducted in accordance with the Rules of the American Arbitration Association (the "Rules") in Delaware by three arbitrators selected in accordance with the Rules.  Judgment on the award of the arbitrators may be entered in any court having jurisdiction over the party against which enforcement of the award is being sought.

D.I. 20, Ex. 2 § 7.10.

grants royalty-bearing rights and non-royalty bearing rights.  According to the defendants, when XCMO was distributed as a stand-alone product, they bundled AppForge's Booster Plus™ with it, as permitted in Section 1.2.1 of the Reseller Agreement, and paid AppForge royalties.  However, because OneBridge had a greater variety of options, the defendants determined that it became less certain that application developers would require Booster Plus™.  The defendants, therefore, decided not to bundle Booster Plus™ with OneBridge; that is, the defendants did not exercise their royalty-bearing rights under the Reseller Agreement.  In marketing OneBridge, the defendants instead exercised their non-royalty bearing rights to leverage the Piedmont SDK to create a set of cross-platform controls under section 1.2.2 of the Reseller Agreement.  In other words, the defendants assert that section 1.2.2 does not restrict their rights to any particular brand name or type of software.  Rather, the provision allows them to use Piedmont SDK to develop cross-platform controls and, thereafter, grants them "a perpetual sublicensable license and right to the use of such cross-platform controls."  (D.I. 27, at 5-6.)

Conversely, AppForge contends that the claims in the case do not in any way arise out of, or in connection with, the Reseller Agreement because they relate to the defendants' use of the AppForge Software in connection with the OneBridge product, not the XCMO product or the Sync Product.  According to AppForge, the Reseller Agreement and the ILA grant ESII a limited license to use the AppForge Software, but only in connection with XCMO and the Sync Product.  Thus, the two agreements do not relate to or address the terms by which the defendants may use the AppForge Software in connection with products other than XCMO and the Sync Product.

AppForge explains why its claims do not arise under the Reseller Agreement.  According to AppForge, its claims for copyright infringement are based solely on the unauthorized use and

copying of its software in connection with OneBridge. Its trademark infringement, unfair competition, and deceptive trade practices claims are based on the unauthorized, confusing, and misleading use by the defendants in connection with the OneBridge product of marks either identical or substantially similar to AppForge trademarks. Its unjust enrichment claim is based upon the defendants use of the AppForge Software and trademarks in connection with marketing and selling OneBridge. Thus, all of AppForge's claims relate to OneBridge and are outside the scope of the arbitration clause.

Lastly, AppForge contends that a proposed stay would be inefficient and complicate matters because ESII is the only party to the Reseller Agreement and AppForge only could assert its claims against ESII in arbitration. Allowing the non-arbitrable claims to proceed, AppForge maintains, would not impair the arbitration because ESII is the only defendant that is a party to the arbitration and thus the arbitrator would not make any determinations regarding the claims between AppForge and ESI.

## III.  STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Pursuant to the FAA, the court should stay an action and compel arbitration when, in a pending suit, "any issue is referable to arbitration." 9 U.S.C. §§ 3,4.  A district court also has the discretion to dismiss an action if all the issues raised are arbitrable and must be submitted to arbitration.  *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004) (citing cases).

Before a court can compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (2003), the court must determine (1) whether the parties entered into a valid arbitration

agreement, and (2) whether the relevant dispute is arbitrable, meaning that it falls within the language of the arbitration agreement. *See John Hancock Mutual Life Insurance Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998) (stating that where a dispute regarding an arbitration agreement is brought before a district court, the scope of the court's authority to become involved is defined by the FAA. *Id.* at 136-37)). In conducting its review, a court should apply the ordinary principles of contract law. *See* 9 U.S.C. § 2; *First Options of Chicago v. Kaplan*, 514 U.S. 938, 945 (1995) (To determine "whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern formation of contracts.") If a contract contains an arbitration clause, a presumption of arbitrability arises. This presumption may be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See Sharon Steel Corp. v. Jewell Coal & Coke Co.*, 735 F.2d 775, 778 (3d Cir. 1984). In addition, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see First Liberty Inv. Gp. v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir. 1998); *Stateside Mach. Co. v. Alperin*, 591 F.2d 234, 240 (3d Cir. 1979) ("doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration").

## IV.    DISCUSSION

In the present case, AppForge does not attack the validity of the arbitration clause of the Reseller Agreement, but it does assert that its claims fall outside the contours of that agreement. Because the scope of the arbitration agreement is at issue, the court may "'engage in a limited review to ensure that the dispute is arbitrable'" and, if appropriate, enter an order to compel or enjoin arbitration. *Id.* (quoting *PaineWebber v. Hartman*, 921 F.2d 507, 511 (3d Cir. 1990)). The

court, in making its review, must answer two questions with respect to whether ESII can compel AppForge to arbitrate its claims: (1) whether the rights and obligations controlling resolution of AppForge's claims arise chiefly under legal principles that would be applicable even if the parties had not entered a contract, or under the Reseller Agreement; and (2) whether it can be said with positive assurance that the arbitration clause in the Reseller Agreement is not susceptible to an interpretation that covers those claims. *See 1mage Software, Inc. v. Reynolds, et al.*, 273 F. Supp. 2d 1168, 1173 (D. Col. 2003). With respect to ESI, the court must determine whether, as a non-signatory to the Reseller Agreement, ESI can compel AppForge to Arbitrate. Lastly, if the court determines that there are both arbitrable and non-arbitrable claims, it must then determine whether to stay the non-arbitrable claims or let them proceed. The court will discuss each of these issues in turn.

A.    **Whether the Rights and Obligations Controlling Resolution of AppForge's Claims Against ESII Arise Chiefly Under the Reseller Agreement**[8]

1. AppForge's Copyright Claims

In a copyright infringement action between two parties who are joint signatories to a contract concerning copyrighted property and providing that lawsuits between the parties shall be settled by arbitration, two resolutions are possible:

> (1) the court could give effect to that contractual provision no less than to the arbitration clause in a straight contract dispute; or (2) given that the plaintiff had opted, *ex hypothesi*, to treat the contract . . . of no operative effect (at least for purposes fo the lawsuit), and is relying on copyright principles that are applicable even when the defendant had never entered into a contract with the plaintiff, the court could determine that it should treat such an infringement action no differently from any other infringement case.

---

[8] The court will address ESI, a non-signatory to the agreements, in section IV.C. below.

3 NIMMER ON COPYRIGHT § 10.15[B] (2004). Under the first resolution, the case would be arbitrable and under the second it would not. *See id.* Thus, based on this distinction between infringement claims postulated on ownership rights that arise under contract and those that must be construed under the Copyright Act, the question that a court must consider in a given case is "where . . . the rights and obligations [that] control the resolution of the dispute arise." *Image Software*, 273 F. Supp. 2d at 1173.

Here, the rights and obligations governing the resolution of whether ESII's use of AppForge's software is unlawful arise under the Reseller Agreement rather than under the Copyright Act. For example, as previously discussed, ESII contends that the Reseller Agreement grants it a non-royalty based, perpetual right to use Piedmont SDK to develop cross-platform controls. ESII further contends that it exercised this right when it used Piedmont SDK to develop cross-platform controls for OneBridge. AppForge, however, maintains that the Reseller Agreement relates to the terms on which ESII could use AppForge's software only in connection with XCMO and the Sync Product. Thus, the merits both of AppForge's claims and ESII's defense turn on the scope and construction of the parties' rights under the Reseller Agreement. As such, the court cannot say that ESII's actions infringe on AppForge's substantive property rights in its software under the Copyright Act.

      2.  AppForge's Federal Trademark and Unfair Competition Claims, and State Law Deceptive Trade Practices Claim

Having determined that AppForge's copyright rights and obligations arise under the Reseller Agreement, the court must determine whether it should reach a different result with respect to AppForge's trademark, unfair competition, and deceptive trade practices claims (collectively, the

"trademark-based claims").  AppForge makes the same assertions with respect to these claims as it does with its copyright claims.  The court is not persuaded and finds that, as with its copyright claims, AppForge's trademark-based claims arise chiefly under the Reseller Agreement because their merits turn on the scope of the rights afforded to the defendants under that agreement.

AppForge's trademark-based claims are based on the alleged unauthorized, confusing, and misleading use by the defendants of marks either identical or substantially similar to AppForge's trademarks, in connection with the OneBridge product.  (D.I. 20, at 15.)  AppForge alleges that ESI's website allows persons throughout the world to download promotional and instructional materials for the OneBridge Mobile Data Suite software that use the AppForge trademarks "on hundreds of occasions," and refers to APPFORGE BOOSTER PLUS as "AppForge Booster Plus from Extended Systems."  Under the terms of the Reseller Agreement, AppForge granted ESII a "personal, nontransferable, nonexclusive, royalty-free right and license to use its trademarks . . . solely in connection with the promotion and sale of, or identifying the Products."  (D.I. 20, Ex. 2 § 1.2.4.)  The "Products" are defined as "any and all AppForge proprietary software . . ." (*Id.* § 1.1.) The license does not limit ESII's use of AppForge's trademarks to any of ESII's software.  Rather, the license is directed at, and requires, ESII to use AppForge's trademarks in connection with any promotion or identification of the AppForge Software.  Because the license grants ESII an unlimited right to use AppForge's trademarks in connection with the AppForge Software, whether ESII acted in accordance with those rights, when it allegedly used AppForge's trademarks unlawfully in marketing OneBridge, arise out of or in connection with the Reseller Agreement.

3.  AppForge's Unjust Enrichment Claim

The court must next determine whether AppForge's unjust enrichment claim also arises

under the Reseller Agreement.  As with the AppForge's other claims, the court concludes that the unjust enrichment claim arises out of or in connection with the Reseller Agreement.  The amended complaint alleges that the defendants' use of AppForge's software and trademarks in connection with OneBridge unjustly enriched the defendants.  AppForge's unjust enrichment claim, therefore, is based on whether the defendants' used its software and trademarks unlawfully and, as discussed above, the rights and obligations controlling resolution of those claims arise chiefly under the Reseller Agreement.  It follows, then, that because AppForge's unjust enrichment claim is based on the same factual allegations as its trademark and copyright claims, the rights and obligations controlling its resolution must also arise chiefly under the Reseller Agreement.

**B.**      **Whether It Can be Said with "Positive Assurance" that the Arbitration Clause is Not Susceptible to an Interpretation that Covers AppForge's Claims Against ESII**

Having determined that AppForge's claims against ESII arise under the Reseller Agreement, the court must now determine whether it can be said with positive assurance that the arbitration clause in section 7.10 of the agreement is not susceptible to an interpretation that covers AppForge's claims.  In other words, the court must determine whether AppForge can overcome the presumption that the dispute is subject to arbitration.

AppForge asserts that because its claims are outside the Reseller Agreement, the arbitration clause is not susceptible to an interpretation that covers those claims.  It relies on the "plain language" of the Reseller Agreement and the ILA for support.  (D.I. 20, at 12.)  The court finds AppForge's assertions unconvincing for several reasons.  First, the arbitration clause is contained in the Reseller Agreement, not the ILA.  Thus, the presumption is that AppForge's claims are subject

13

to arbitration under the Reseller Agreement and not the ILA.  In addition, the ILA is a fully integrated contract that stands separately from the Reseller Agreement, and is governed by different state laws.[9]  Moreover, while the ILA incorporates certain provisions of the Reseller Agreement, the Reseller Agreement does not reciprocate.  For example, the ILA states that Piedmont SDK "shall only be used with your Customer Products [*i.e.* XCMO] and may not be sold, licensed, leased, transferred, published or used separately from the Customer Products."  This language, however, is absent from the Reseller Agreement.  The court, therefore, cannot read the ILA's grant of a limited license to use the AppForge Software only in connection with XCMO and the Sync Product into the Reseller Agreement.[10]

Second, as to AppForge's copyright claims, the Reseller Agreement grants ESII two distinct copyright licenses in the AppForge Software.  Pursuant to the "Non-exclusive Appointment/License," section 1.2.1, AppForge grants ESII a "nonexclusive right and license to use the AppForge Booster Plus™ only as a bundled product for resale with [XCMO] and the ESI Sync Product."  Under the "Right to Use Technology," section 1.2.2,  AppForge grants ESII the right to "leverage the Piedmont Software Development Kit [SDK] to create a set of cross-platform controls that integrate Reseller's [ESII's] client-side technology with AppForge Booster Plus™.  Upon creation of such cross-platform controls, AppForge shall be deemed to have granted Reseller [ESII]

---

[9] The ILA states: "[t]his agreement, including, without limitations, all provisions of the Reseller Agreement referenced herein, sets forth the entire agreement between you and AppForge and may be amended only in writing signed by both parties."  (D.I. 20, Ex. 1 § 8.1.) Furthermore, the ILA is governed by Georgia law, while the Reseller Agreement is governed by Delaware law.  (*Id.* § 8.2.)

[10] It is also notable that the ILA only grants ESII a copyright license.  Thus, AppForge could not rely on the ILA to support its assertions regarding its trademark-based and unjust enrichment claims.

a perpetual, sub-licensable license and right to the use of such cross-platform controls."  Absent from the second grant of rights is the language that ESII may use Piedmont SDK only with XCMO and the Sync Product.  Thus, to the degree that ESII has a colorable claim that AppForge granted it a non-royalty based license to use Piedmont SDK without restricting its use to any brand name or type of software, it seems that the arbitration clause of the Reseller Agreement would cover the parties' dispute.  At the very least, the court cannot say with "positive assurance" that the arbitration clause is not susceptible to an interpretation that covers AppForge's copyright claims.

The same is true of AppForge's trademark-based claims.  As previously discussed, the Reseller Agreement grants ESII a royalty-free license to use its trademarks and requires ESII to use AppForge's trademarks when promoting and/or identifying AppForge's proprietary software.  AppForge alleges that the defendants are unlawfully using its APPFORGE, APPFORGE BOOSTER, APPFORGE & Design, and APPFORGE MOBILEVB trademarks in connection with OneBridge.  ESII, however, contends that it merely provides an Internet hyperlink to AppForge's website, where an end user could download a free, temporary evaluation copy of AppForge Booster Plus™ or purchase a non-evaluation version of the software.  According to ESII, end users that are directed to the AppForge website who desire to purchase AppForge Booster Plus™ do so through AppForge, not ESII.  Thus, ESII claims that it is using AppForge's trademarks to identify AppForge proprietary software, as required by the Reseller Agreement.  To the extent ESII has a colorable claim that AppForge's trademark-based claims are disputes about the scope of the trademark license, the court cannot say with positive assurance that the arbitration clause is not susceptible to an

15

interpretation that covers those claims.[11]

### C. Whether ESI, a Non-Signatory to the Reseller Agreement, Can Compel AppForge to Arbitrate Its Claims

ESI maintains that the arbitration in the present case should not be limited to AppForge and ESII, the two signatories to the Reseller Agreement. According to ESI, as the parent company of ESII, it can enforce the Reseller Agreement under the theory of equitable estoppel and as a third party beneficiary. The court disagrees. Generally, arbitration clauses can be enforced only by signatories – a non-signatory cannot be bound unless it is bound "'under traditional principles of contract and agency law.'" *See, e.g.*, *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (citing *Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)); *Dayhoff v. H.J. Heinz Co.*, 86 F.3d 1287, 1296 (3d Cir. 1986). "[A] court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute." *Bel-Ray*, 181 F.3d at 444 ("Arbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."). ESI asserts that it can compel AppForge to arbitrate under the theory of equitable estoppel and as third party beneficiary to the Reseller Agreement. These are recognized principles of contract law, which are applicable when determining whether to compel a party to arbitrate. *See E.I. Dupont*, 269 F.3d at 195 (citing cases). The court will consider each of ESI's assertions in

---

[11] Because AppForge's unjust enrichment claim is based in ESII's allegedly unlawful use of AppForge's copyrighted software and trademarks, the court cannot say with positive assurance that the arbitration clause is not susceptible to an interpretation that also covers this claim.

turn.[12]

a. Equitable Estoppel

Under the theory of equitable estoppel, courts have bound non-signatories to arbitrate in two circumstances: (1) "when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement," *Thomason-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 778 (2d Cir. 1995); and (2) "at the non-signatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'" *Id.* at 779. It is not clear to the court whether ESI contends that the first, second, or both circumstances apply in the present case, because the only assertion that ESI tenders is the statement that "courts have recognized 'a series of cases in which signatories were held to arbitrate related claims against parent companies who were not signatories to the arbitration clause." (D.I. 14, at 5.) According to ESI, "[t]hat is exactly the situation among the parties here" and, "[a]s a result, the Plaintiff is estopped from avoiding the arbitration clause." *Id.* Absent from ESI's brief, remarkably, is any discussion of either the fact that it knowingly exploited the Reseller Agreement despite having never signed it, or the close relationship between ESII and ESI, the relationship of the alleged wrongs to ESI's obligations and duties in the Reseller Agreement and the fact that the claims were

_____

[12] In its reply brief to the motion to compel, ESI seems to have withdrawn from its earlier contentions that it can compel arbitration. *See* D.I. 27, at 8 ("Whether ESI by itself could compel arbitration is a question the court need not decide. The only issue is whether the claims against ESI and the other defendants should be dismissed or stayed pending the arbitration.") Nevertheless, the court will address the equitable estoppel and third party beneficiary theories.

intertwined with the underlying contractual obligations. *See Thomason-CSF*, 64 F.3d at 779. As such, the court concludes that ESI cannot enforce arbitration under the theory of equitable estoppel.

### b. Third Party Beneficiary

ESI next maintains that it can compel arbitration because it is a third party beneficiary to the Reseller Agreement. Courts have held that non-signatory third party beneficiaries can compel arbitration against signatories of arbitration agreements. *See E.I. Dupont*, 269 F.3d at 195 (noting that "whether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary.") Under Delaware law, a party must meet three conditions to qualify as a third party beneficiary:

> (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

*Id.* at 196 (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (1990)). ESI asserts that it is entitled to enforce the arbitration clause as a third party to the Reseller Agreement because AppForge intended to benefit ESI at the time it entered the contract with ESII. According to ESI, evidence of AppForge's intent to benefit it can be found in the press releases each company issued after signing the agreement – that is, AppForge's press release referred to ESI by its ticker symbol, not ESII. ESI's argument is weak at best. While referring to ESI by its ticker symbol may be evidence that AppForge and ESII intended ESI to benefit from the Reseller Agreement, ESI has not made any assertions regarding the remaining factors necessary to establish its status as a third party beneficiary. Indeed, the record is devoid of any evidence that ESI's purported benefit was intended as a gift or in satisfaction of a pre-existing obligation it was owed.

Additionally, the record does not even suggest that AppForge and ESII's alleged intent to benefit ESI was a material part of their purpose in entering the Reseller Agreement. ESI, therefore, cannot enforce arbitration as a third party beneficiary to the Reseller Agreement.

### D. Whether the Court Should Stay the Non-Arbitrable Claims

The FAA provides for a stay of the proceedings when "any issue" is referable to arbitration. *See* 9 U.S.C. § 3. That is a court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989) (noting that the *Shearson* Court "stressed that if an issue is arbitrable under the agreement, the Arbitration Act leaves a court without discretion"). Alternatively, a district court has the discretion to dismiss an action if all of the issues raised are arbitrable. *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004).

In the present case, the court has determined that AppForge's claims against ESII are arbitrable. AppForge's claims against ESI and the ESI Foreign Subsidiaries, however, are not arbitrable because: (1) ESI and the ESI Foreign Subsidiaries are not signatories to the agreement; (2) equitable estoppel does not apply to ESI; (3) ESI is not a third party beneficiary; and (4) the ESI Foreign Subsidiaries have not joined the motion to compel. Thus, the court must decide whether it should stay the non-arbitrable claims.

AppForge contends that regardless of whether some or all of its claims against the defendants are arbitrable, the court should stay only the arbitrable claims because staying all claims will force AppForge to either (a) forego its arbitrable claims, or (b) wait months, if not years, before the court

hears the non-arbitrable claims.  (D.I. 20, at 16-17.)  ESII and ESI assert that arbitrating concurrently with the litigation would be inefficient because it would (1) require the parties to resolve their controversies in two forums, and (2) impair the arbitration because of the potential preclusive effect of the litigation.  (D.I. 14, at 8.)  ESII and ESI further assert that staying the case would streamline subsequent proceedings before the court, and that AppForge would not be prejudiced by an inability to pursue its claims against the defendants other than ESII because "all the defendants in the case will submit to be bound by any factual adjudications in the arbitration."  (D.I. 14, at 7-8; D.I. 27, at 9.)  The court agrees with ESI and ESII.  Because AppForge's claims against ESII are arbitrable, AppForge's claims against ESI and the ESI Foreign Subsidiaries are similar, if not identical, to its claims against ESII, and ESI and the ESI Foreign Subsidiaries have conceded that they will be bound by any factual adjudications in the arbitration, the court concludes that staying the non-arbitrable claims is the proper result.  Accordingly, the court will grant ESII's motion to compel and stay the case pending the outcome of arbitration.


Dated: March 28 , 2005                          /s/ Gregory M. Sleet
                                                  UNITED STATES DISTRICT JUDGE

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

APPFORGE, INC.,                              )
                                             )
              Plaintiff,                     )
                                             )
       v.                                    )        C.A. No. 04-704 (GMS)
                                             )
EXTENDED SYSTEMS, INC.,                      )
EXTENDED SYSTEMS OF IDAHO, INC.,             )
EXTENDED SYSTEMS, LTD.,                      )
EXTENDED SYSTEMS BENELUX B.V.,               )
EXTENDED SYSTEMS, GMBH, and                  )
EXTENDED SYSTEMS FRANCE, SARL.               )
                                             )
              Defendants.                    )

## ORDER

       For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

   1.    ESI and ESII's Motion to Compel Arbitration (D.I. 6, 13) is GRANTED as to ESII

         and DENIED as to ESI.

   2.    The case shall be STAYED pending the outcome of arbitration.

   3.    ESI, ESI Limited, ESI Benelux, ESI GmbH, and ESI France shall be bound by any

         factual adjudications in the arbitration.


Dated: March 28 , 2005                       /s/ Gregory M. Sleet_____
                                             UNITED STATES DISTRICT JUDGE